1 | STEPHANIE M. HINDS (CABN 154284)
United States Attorney
2
THOMAS A. COLTHURST (CABN 99493)
3 | Chief, Criminal Division
4 | ERIC CHENG (CABN 274118)
FRANK J. RIEBLI (CABN 221152)
5 | Assistant United States Attorney
6     450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
7     Telephone: (415) 436-7200
    FAX: (415) 436-7234
8     Eric.Cheng@usdoj.gov
    Frank.Riebli@usdoj.gov
9
Attorneys for United States of America

10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case Nos. 21-CR-0105 VC; 21-CR-0121 VC-2 |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Sentencing Date: August 22, 2022 |
| ROBERT JESUS BLANCAS, | Time: 1:00 p.m. |
| Defendant. | Judge: Hon. Vince Chhabria |

## I. INTRODUCTION

Beginning in April 2020, defendant Robert BLANCAS joined and helped lead an armed militia group that discussed, trained, and prepared for hostilities against the government and confrontations with law enforcement. He was appointed a "First Lieutenant" of the "Grizzly Scouts" and took part in a forum for members to fuel the aggressions of the group toward violence. The group's conversations escalated to discussions about targeting law enforcement, and one of their members carried out such an attack on two federal protective services officers in Oakland on May 29, 2020 (and allegedly ambushed sheriff's deputies in Santa Cruz County a week later). BLANCAS's reaction when faced with the reality of that man's horrific actions, given the violent nature of the group's prior discussions and preparations, was to obstruct justice—he immediately deleted documents about the group and conspired with other members of the group to destroy other evidence. And rather than terminate any further activities with the group or come forward to authorities about Carrillo, BLANCAS and his coconspirators did the opposite: they then moved their discussions to an alternative communications platform, encouraging others to reconnect with them more securely there. Only after federal agents executed search warrants at their residences two months later, seizing numerous firearms including assault-style weapons, stockpiles of ammunition, and tactical equipment, did the group's activities finally appear to cease.

During the same timeframe as BLANCAS' involvement with the Grizzly Scouts, BLANCAS also began grooming a 15 year old girl, Victim 1, directing her to send him pornographic videos of herself via social media and communication applications over the Internet. BLANCAS was already experienced in sexually explicit communications with other minors, having previously exchanged such communications with users who had identified their ages to him as 13, 15, and 16. Knowing that Victim 1 was a minor, BLANCAS continued exchanging thousands of messages with Victim 1 for several months, including sexually explicit messages and instructions to produce over one hundred pornographic photographs and videos to him.

Accordingly, BLANCAS must be held accountable for these crimes with a meaningful custodial sentence. The United States respectfully recommends that the Court sentence BLANCAS to 180 months (15 years) of custody, followed by ten years of supervised release. Given the nature and circumstances of the offenses, BLANCAS's history and characteristics, the seriousness of the offenses,

and the need for deterrence, the government submits that this sentence would be sufficient but not greater than necessary, based on a consideration of the Sentencing Guidelines and the factors under 18 U.S.C. § 3553(a).

## II. BACKGROUND

### A. Case No. 21-CR-0121 VC-2

In April 2020, Jessie RUSH organized an armed, anti-government militia group called the "Grizzly Scouts" as the group's commanding officer. *See* Presentence Investigation Report (Dkt. No. 56[1], "PSR") ¶ 19. RUSH recruited several of the Grizzly Scouts's members, including BLANCAS and coconspirators Simon YBARRA and Kenny MIKSCH, as well as Steven Carrillo, through a Facebook group he created. PSR ¶¶ 19–20. The Facebook group's front page stated the group's association with so-called "boogaloo" extremists:[2] "they say the west won't boog, were [sic] here to gather like minded Californians who can network and establish local goon squads". *Id.* RUSH made MIKSCH and BLANCAS lieutenants, and YBARRA a corporal. *Id.* BLANCAS's responsibilities included "security" and "intelligence." *Id.* Carrillo was given the rank of "staff sergeant." *Id.*

The Grizzly Scouts discussed, trained, and prepared for violent confrontations with the government and attacks on law enforcement. PSR ¶ 22; Plea Agmt. (Dkt. No. 41) at ¶ 2. In May 2020, for example, the Grizzly Scouts prepared for operations, including at a protest in Sacramento. In advance, they distributed "Operations Orders" that identified law enforcement as "enemy forces" and considered the possibility of using lethal force. PSR ¶ 22 ("Contact with hostile forces … If there is a PERCEIVED or what could be articulated as an IMMEDIATE threat, engage the enemy swiftly and with extreme lethality."). The orders also discussed taking prisoners, stating "POWs will be searched for intel and gear, interrogated, stripped naked, blindfolded, driven away and released into the

---

[1] Docket Numbers reference Case No. 21-CR-105 VC, unless otherwise specified.

[2] As explained in the indictment and PSR, the "boogaloo" is not a single cohesive group, but rather a loose concept which has become a rallying point for some extremists. The term is sometimes used by militia extremists and racially or ethnically motivated violent extremists (RMVE), who allude to it using shorthand such as "big igloo" or "big luau" and imagery such as igloos or Hawaiian shirts. The term has particularly resonated with militia extremists, who have adopted it to reference an impending politically-motivated civil war or uprising against the government following perceived incursions on Constitutional rights—including the Second Amendment—or other perceived government overreach. Some RMVEs have used the term to reference an impending race war—or other conflict that will lead to the collapse of the "system," including the U.S. government and society. PSR ¶ 16.

wilderness blindfolded with hands bound. We will not execute POWs; however, we will not render medical aid to enemy WIA [wounded in action]. Enemy WIA will be given some water, searched for intel, interrogated, depending on nature of injury driven to the wilderness or left to their god." *Id.* In other words, the best outcome for a police officer captured by the Grizzly Scouts would be getting stripped naked and dumped in the wilderness, blindfolded and bound, quite possibly to die. The order also established a so-called "QRF," or a Quick Reaction Force sub-unit that included RUSH, MIKSCH, and Carrillo, in the event that whoever they sent into the protest ran into trouble. *Id.* QRF members were required to carry a rifle and pistol and extra magazines and their job was to rescue the recon element. *Id.*

Toward the end of May and beginning of June, the Grizzly Scouts's discussions of attacks on law enforcement matured. Between May 26 and 27, 2020, YBARRA and Carrillo began to discuss plans. PSR ¶ 23. YBARRA wrote, "I feel it. I partially just want a concrete plan". "I feel like that one had some holes", he said. *Id.* Carrillo said his vision was "cartel style." *Id.* YBARRA responded, "Bro we have to talk about this in person". "There needs to be a protocol in place, and it needs to be done a certain way. We can talk about this and reach an understanding about how this needs to work." *Id.* They met behind a gas station in Los Gatos, near YBARRA's home, and sat in the man's van and assembled an assault rifle. *Id.* The day after that, May 28, 2020, Carrillo contacted YBARRA about attending a protest in Oakland the next day, on May 29, 2020, to "snipe some you know what's [sic]." *Id.* YBARRA does not appear to have responded, but that night Carrillo ambushed two federal protective service officers at the federal courthouse in Oakland, killing one and wounding another. That murder and attempted murder were charged in a separate federal case arising out of that incident. PSR ¶¶ 8–9, 17–18.

At the same time YBARRA was discussing plans to attack law enforcement with Carrillo, YBARRA was also reporting those conversations to RUSH. On May 26–27, 2020, he told RUSH that he had spoken with Carrillo; RUSH added, "yea we need to actually develop targets and cases, be smart. They want war, then we bring em war." PSR ¶ 24. In other words, it wasn't the idea of killing people that RUSH or YBARRA opposed, they just didn't want to kill purportedly low-value targets. RUSH confirmed this a moment later: "we can start developing case files, gathering intel, and doing it just like

big bro does" "im not about the fireworks" "im more like a surgeon". *Id.* RUSH also said "the gov spent 100s of thousands of dollars on training me, im gonna use that shit", meaning that he was going to put his military training to use in planning their attacks. *Id.*

On May 29, 2020, within an hour after the shooting at the federal courthouse in Oakland, MIKSCH sent a notification stating "Federal Building Security Guard Shot" to a group labeled "riot med qrf" including BLANCAS and YBARRA, going on to say, "So it begins". PSR ¶ 25. MIKSCH went to Oakland that night and exchanged Facebook messages about the protests in Oakland. *Id.*

On June 1, 2020—just three days after the shootings in Oakland—YBARRA and Carrillo continued to communicate, including with YBARRA stating, "bro I'm sorry I didn't get back to you, I was a little spooked because you reached out to me about that over an unsecure line." PSR ¶ 26. Meanwhile, the Grizzly Scouts ratcheted up their rhetoric and preparation for attacks on law enforcement. Carrillo sent the group a link to an article about the potential invocation of the insurrection act in response to the nationwide protests in the wake of George Floyd's death. In response, RUSH said: "That effectively means the federal gov has declared war in things they're afraid of. Anything like this or a move that resonates with this is our trigger point. If y'all aint giving with that bail now". PSR ¶ 27. In other words, RUSH was preparing the group for war against the government. And in response to Carrillo's further statement about "easy pickins first to demoralize" regarding law enforcement, RUSH told the group, "Get right with your gods, families and selves." "If you weren't ready, I sure as hell hope you fake the funk good," he added. *Id.* "This is unfortunately one instance where fake it till you make it doesn't cut it," MIKSCH responded. *Id.* "I think it's time to swap your plates bud" RUSH told MIKSCH, meaning, it was time for MIKSCH to put heavier-duty protective plates in his bullet-proof vest. After Carrillo inquired to the group regarding the Oakland Police Department, "Well shall we go out tonight and thin their herd? … I was under the impression the [National] guard would be there but if theyre not there yet then we still have a chance", RUSH responded, "even when they show up you still have a chance". *Id.*

By June 2 and 3, 2020, the Grizzly Scouts began to discuss whether it would be better to provide aid to "Antifa" groups to encourage them to attack law enforcement first, then open their own campaign of violence against a (presumably) weakened police force. In referencing this, BLANCAS called it "the

tactically sound option". PSR ¶ 28. Carrillo went on to say "Tactically, we should be yeeting solo cops and taking their shit" (that is, shooting police officers and stealing their equipment) and BLANCAS insisted that "Them fucking each other up only helps us". PSR ¶ 25. In response, YBARRA gave a thumbs-up emoji. *Id.* Step One, as BLANCAS saw it, was "Antifa" and police engaging in armed confrontation. "[S]tep two, cops win. Third step is we start yeeting cops when they're done. I'm also totally down with disguising ourselves as antifa and [yeeting] some cops that way", he said, meaning that he was willing to pose as member of "Antifa" and kill police officers as a way to instigate an all-out confrontation between the police and those groups. *Id.* BLANCAS added, "Third gen warfare … It's less about dropping bodies and more about swaying the public opinion". *Id.*

Throughout these conversations, Carrillo advocated openly for attacking the police immediately. None of the other Grizzly Scouts, including BLANCAS, disagreed with him; to them, it was a question of "When" or "How," not "If." Three days later, on June 6, 2020 in Santa Cruz County, Carrillo is alleged to have gotten into a shootout with sheriff's deputies, killing one and wounding another. PSR ¶¶ 10–18. In the moments leading up to those shootings (which are the basis for pending state murder and attempted murder charges), Carrillo communicated with the rest of the Grizzly Scouts, including BLANCAS, asking them to come to his aid. PSR ¶ 29. MIKSCH—who later admitted that he and the group generally listened to police scanners—notified the group that "they," meaning the sheriff's deputies, "have a dog," meaning a police K9 (which the deputies in fact had), but that he didn't think it was a planned raid because "[t]rue raids are usually done at like 3-4" in the morning. *Id.* RUSH agreed. But Carrillo believed the deputies were there for him. "Dudes I offed a fed" he told the other Grizzly Scouts. *Id.* RUSH's first response was to tell Carrillo to erase the evidence on his phone and "exfil," meaning, evade capture. PSR ¶ 30; RUSH Plea Agmt. (Case No. 21-CR-121, Dkt. No. 83) at ¶ 2.

Sheriff's deputies captured Carrillo later that day, but BLANCAS and his coconspirators moved quickly to destroy evidence to obstruct official proceedings. PSR ¶¶ 13, 31–32. BLANCAS immediately destroyed files on Dropbox related to the Grizzly Scouts's operations, and YBARRA drove to meet RUSH in person in Turlock later that same day. *Id.* The group conspired together to erase the communications in which they discussed and planned to attack police from their phones. PSR ¶¶ 31–32; Plea Agmt. at ¶ 2. As BLANCAS told YBARRA a month later, "We burned tf [the fuck] out of

everything" – "All physical files I had were literally burned". PSR ¶ 32.

And contrary to what they would all later tell FBI agents, the Grizzly Scouts didn't disband. They just switched to a different communications platform, one they thought would be more secure. PSR ¶ 32; Plea Agmt. at ¶ 2. Nor did they appear chastened by the fact that one of their members could be involved with these officer shootings. Instead, in messages the day after the second shootout, it was clear that they were mad at him for making it more difficult for them to operate as a group, but not for allegedly killing police officers. They got over their heartache quickly though, as they began contacting other Grizzly Scouts and recruiting them to join them on the new communications platform. PSR ¶ 32.

On August 6, 2020, two months after the shooting in Santa Cruz County, FBI agents executed search warrants at several locations, including RUSH's, BLANCAS's, YBARRA's, and MIKSCH's residences and vehicles. PSR ¶ 33. They seized numerous assembled and disassembled weapons, including the following items from BLANCAS: two assault-style rifles and one pistol, body armor, ammunition, and a Grizzly Scouts operation order. *Id.*

Agents also seized their cell phones. Plea Agmt. at ¶ 13. Subsequent examinations of certain of those phones showed that they were the same devices used by the men on June 6, 2020, when the Grizzly Scouts were communicating with their member who allegedly engaged in a shootout with sheriff's deputies—but those communications had been erased from their phones. Plea Agmt. at ¶ 2.

### B. Case No. 21-CR-0105 VC

In addition to BLANCAS's phone and other electronic devices showing that he and the Grizzly Scouts destroyed evidence relating to the group's activities, BLANCAS's devices also contained evidence of his enticement of minors, as well as his receipt and production of child pornography. PSR ¶ 34. Specifically, BLANCAS's devices showed that he previously had explicit communications with users who had identified their ages as 13, 15 and 16 to him. PSR ¶ 40. For example, in July 2015, Blancas asked a user on the online communications application Whisper "How old are you?" and the user responded "16." Blancas then sent the user an image of male genitalia, discussed physically traveling to the user's location, exchanged sexually suggestive messages, and shared user IDs for Kik Messenger, another online communications application. *Id.*

During the same time of BLANCAS's involvement with the Grizzly Scouts, BLANCAS met

Victim 1—a 15 year old girl—in or about April 2020 on Whisper in a forum labeled "DDLG" (an abbreviation for "Daddy-Daughter Little Girl"). PSR ¶ 35; Plea Agmt. at ¶ 2. He exchanged nearly 1000 messages with Victim 1 on Whisper, including sexually explicit messages, before asking about her age and suggesting that they move the conversation to Kik Messenger. *Id.* PSR ¶¶ 35–37; Plea Agmt. at ¶ 2. Once on the Kik application, BLANCAS repeatedly instructed Victim 1 to make and send him pornographic images and videos of herself. *Id.* On multiple occasions, BLANCAS directed Victim 1 to perform specific sexual acts on specific parts of her body in specific positions, and she sent him the photos and videos he requested. PSR ¶¶ 37–39; Plea Agmt. at ¶ 2.

In Victim 1's communications with BLANCAS, she made several references to her parents, her schoolwork, and "P.E." class, and photos and videos of her bedroom showed the bedroom of young girl. Furthermore, in July 2020, Victim 1 sent Blancas an image of her report card, and a simple Google search of the name depicted on the report card showed that Victim 1 was 15 years old and in middle school. PSR ¶ 35. BLANCAS admitted in his plea agreement that he knew Victim 1 was a minor when he directed Victim 1 to produce pornographic photographs/videos of herself and instructed her to send them to him, and that directing Victim 1 to produce and send him pornographic images and videos constituted the production of child pornography. Plea Agmt. at ¶ 2.

In his communications with Victim 1 over the Internet, BLANCAS directed her to produce and received from her at least 77 pornographic photographs and 31 videos. Plea Agmt. at ¶ 2. BLANCAS exchanged more than a thousand Kik messages with Victim 1 on Kik. *Id.* BLANCAS also exchanged more than 7000 text messages with Victim 1 by mobile phone, and repeatedly spoke with her by audio call (*e.g.*, telephone) and video call (*e.g.*, Skype). *Id.*

C.  **Procedural Background**

BLANCAS was charged by complaint with enticement of a minor to engage in sexual activity on November 20, 2020. Dkt. No. 1. BLANCAS was arrested on December 1, 2020 and has remained in federal custody since then. Dkt. No. 4. The government filed an Information for the same charge on March 11, and BLANCAS waived indictment. Dkt. Nos. 17, 18, 19.

The grand jury indicted RUSH, BLANCAS, YBARRA, and MIKSCH on the conspiracy and obstruction charges related to the Grizzly Scouts on March 23, 2021. Case No. 21-CR-121, Dkt. No. 1.

On August 23, 2021, BLANCAS pleaded guilty to Count One of the Information in Case No. 21-CR-105 and Counts One, Two, and Four of the Indictment in Case No. 21-CR-121 pursuant to a plea agreement as two both matters under Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure. Dkt. No. 41. Sentencing is set for August 22, 2022.

### D. Victim Impact

Victim 1 (15 years old at the time of BLANCAS's conduct), as well as her mother and her father, have each submitted Victim Impact Statements to the Court in this matter. They wish to observe the sentencing hearing remotely.

## III. DISCUSSION

### A. Applicable Law

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991–93. Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B. Guidelines Calculation

The United States Probation Office ("Probation") accurately calculates the United States Sentencing Guidelines in the PSR, and it is consistent with the parties' plea agreement. PSR ¶¶ 45–68;

Dkt. No. 76 ¶ 7.

The PSR correctly calculates the defendant's criminal history as category I, as the defendant has no prior criminal history. PSR ¶¶ 69–72.

The counts of conviction within Case Nos. 21-CR-105 and 21-CR-121, respectively, are grouped as follows for guideline calculation purposes:

- Regarding Group 1 (Case No. 21-CR-121), the PSR correctly calculates the adjusted offense level as 16. PSR ¶ 52. The base offense level is 14 under U.S.S.G. § 2J1.2(a), and a two-level enhancement applies because the offense involved the destruction of essential records; in this case, records related to the murder of a federal protective services officer just days prior under § 2J1.2(b)(3)(B). PSR ¶¶ 47–48.

- As for Group 2 (Case No. 21-CR-105), the PSR also correctly calculates the adjusted offense level as 38. PSR ¶ 60. The base offense level is 32 under U.S.S.G. § 2G1.3(c)(1) and 2G2.1(a). PSR ¶ 53. Three enhancements apply under each of U.S.S.G. §§ 2G2.1(b)(1)(B) (minor was less than 16 years old), 2G2.1(b)(2)(A) (involved commission of a sexual act), and 2G2.1(b)(6)(B) (use of a computer or other interactive device), and each is a two-level enhancement. PSR ¶¶ 54–56.

- Combining these two groupings results in no upward adjustment, so the combined adjusted offense level is 38 (from Group 2). PSR ¶¶ 61–64.

The government also agrees with the three-level reduction for acceptance of responsibility under § 3E1.1. PSR ¶¶ 66–67.

Because the total offense level is 35 and the defendant's criminal history category is I, the sentencing range under the Guidelines is **168 to 210 months** of imprisonment. PSR ¶ 106.

### C. Mandatory Minimums

The conviction of Enticement of a Minor to Engage in Sexual Activity in violation of 18 U.S.C. § 2422(b) carries a mandatory minimum prison term of 10 years and a mandatory minimum supervised release term of 5 years.

### D. Recommendation

The government recommends that the Court impose a sentence of 180 months (15 years) of

imprisonment followed by ten years of supervised release (the same term of supervised release recommended by Probation), based upon a consideration of the Guidelines and 18 U.S.C. § 3553(a) factors. This sentence would be sufficient but not greater than necessary based on the nature and circumstances of the offense, BLANCAS's history and characteristics, the seriousness of the offense, and the need for deterrence.

First, the nature and circumstances of both groups of BLANCAS's offenses support a meaningful custodial sentence. Before his destruction of and conspiracy regarding records related to the Grizzly Scouts, BLANCAS joined the armed militia group, gained responsibilities for "security" and "intelligence," and actively took part in encouraging aggression against authorities. BLANCAS held roles in the group's "operations orders" in the field and he stoked anger in discussions about violence against law enforcement. He even advocated for what he described as "Third gen warfare," which would involve killing law enforcement disguised as certain other groups to pit them against law enforcement. It was in this backdrop that BLANCAS ultimately obstructed justice when he learned of the deadly actions by another member of his group. With respect to Victim 1, the extent and deliberate way in which BLANCAS identified and groomed a 15 year old girl must be emphasized in determining the appropriate sentence—with his thousands of messages, phone calls, and video calls over the course of months—to make her produce more than a hundred images and videos of child pornography to him.

Second, BLANCAS's history and characteristics warrant the custodial sentence recommended by the government. As described above, BLANCAS's predatory behavior with Victim 1 was far from the first time he had engaged in such conduct; rather, it was only the first time he actually got caught by authorities. The evidence from his electronic devices demonstrated a similar pattern (years earlier) of BLANCAS's explicit communications with other users who had identified themselves as young as 13, 15, and 16. This prior history demonstrates that BLANCAS's wrongful conduct in this case was clearly no accident or impulse, but rather a continuation of years of the same illegal behavior.

Third, the government's recommended custodial sentence accounts for the seriousness of BLANCAS's crimes across both groups of BLANCAS's offenses. In light of BLANCAS's participation in the Grizzly Scouts's abhorrent discussions about committing violence against law enforcement and armed uprising against authorities, as well as the group's training and preparations

together, BLANCAS destroyed records relevant to the murder of a federal officer and destroyed those records to obstruct any subsequent investigation or prosecution—and conspired with his coconspirators to do so. Moreover, BLANCAS's further exploitative conduct in this case involves the production of child pornography, which is a violation that otherwise carries a 15-year mandatory minimum sentence. *See* 18 U.S.C. § 2251(a). The government's recommendation promotes respect for the law and provides just punishment for BLANCAS in view of all of this wrongful conduct, and it also avoids unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

Fourth, the government's recommendation takes into account the unspeakable impact of BLANCAS's crimes on his victims. In her Victim Impact Statement, Victim 1, a 15 year old girl at the time of BLANCAS's conduct, describes "shame and guilt" from the events, and, among other things, fear, paranoia, and a loss of interest in school work and hobbies. She wishes she "could be a carefree teenager," but instead states "I will have to carry with me for the rest of my life. That's why I can thoroughly say with my whole chest that I hate him and will never forgive him for what he's done to me."

Finally, the Court's sentence should provide general deterrence to others against conspiring to commit such obstruction in the midst of extremist aggression and potential violence, as well as general deterrence against the exploitation of children over the Internet. Accordingly, this case merits the 15-year custodial sentence recommended by the government in view of the need to achieve general deterrence for others who may be tempted to obstruct justice in violation of the law, and those who may desire to prey on minors over the Internet to produce child pornography. The government also agrees with Probation's recommendation for a ten-year term of supervised release, including an expanded suspicionless search condition and the other recommended conditions by Probation for a case involving child exploitation, as this is necessary to serve the interests of specific deterrence and rehabilitation given the nature of BLANCAS's conduct.

//

//

//

## IV. CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the Court impose a sentence of 180 months (15 years) in custody on BLANCAS, followed by ten years of supervised release with the expanded suspicionless search condition agreed to by the parties and other conditions recommended by Probation.

DATED: August 15, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

_/s/_
ERIC CHENG
FRANK RIEBLI
Assistant United States Attorneys